## No. 6030.

## EX PARTE GALLAHER.

HABEAS CORPUS—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a judgment refusing bail—murder being the offense alleged against the relator.

HABEAS CORPUS on appeal from the District Court of Wharton. Tried below before the Hon. W. H. Burkhart.

The relator was held under two indictments, the first charging him with the murder of Mary K. Brown, and the second with the murder of Mayo Brown. The writ of habeas corpus to secure bail was awarded to cover both indictments, and, by agreement of counsel for the State and the relator, the two cases were submitted and disposed of on the same testimony. Bail being refused in each case, the relator appealed to this court, which reverses the judgment and awards bail in the sum of five thousand dollars in each case.

As usual in habeas corpus cases, the testimony for the relator was first presented on the hearing below. But, to disclose the case more connectedly, the order of presentation is reversed in this report, and the evidence on the part of the State is first set out.

David James was the first witness for the State. He testified that he lived on the relator's plantation, in Wharton county, Texas, in a house rented from the relator. He knew Mrs. Mary K. Brown and her son Mayo in their life time, and saw them last alive early on the night of Wednesday, December 7, 1887, when they were taken away from his, witness's, house by two white men who represented themselves to be officers of the law. While sitting at the supper table with his wife, between seven and eight o'clock on the said Wednesday night, the witness's attention was attracted by the baying of his dog in the rear of his house. He went to his back door and opened it, when two white men with handkerchief masks on their faces and pistols in their hands rushed past witness into his house, going through the kitchen into the back room, and thence into the room occupied by Mrs. Brown. The taller of the two men

told Mrs. Brown that he and his companion were officers and had come to take her to jail in Wharton. That man told Mrs. Brown his name was Jones. Mrs. Brown replied that she knew Mr. Jones, and that he was a nice man, and then proceeded to beg the men to permit her to pass the night at witness's house, and to defer her removal to jail until morning. The men replied that they were going to remove Mrs. Brown and her son to jail at once, and accordingly took the woman and the boy to the front gate, which was some twenty-five or thirty steps from the front door. At that point they stopped, and, after some struggling, succeeded in tying their prisoners. They then left, taking Mrs. Brown and the boy with them. Very soon after the arrival of the masked men, the witness saw the gin hands, Johnson Williams, Ben Endy, Grant Allen, William Smith, Jim Jones and Jim Harris, coming toward his, witness's, house. They came near enough to hear what was said by the masked men, and, when the men with the Browns had passed around the farm fence, they came to the house and remained with witness for a considerable time. About an hour after the Browns were taken off, the witness heard two reports from a pistol, which sounded to him in his house as if fired in a northerly direction. The witness never saw Mrs. Brown nor her son alive after the men passed beyond the farm fence with them.

One of the masked men was about the size of the relator. He was tall and spare built. The other was a shorter and heavier man. The man who seized Mrs. Brown had on gray clothes. Both men wore broad brimmed gray colored hats. Each had on a coat, and the trouser legs of each were stuffed into their boot tops. Neither of them spoke to the witness, but rushed by him in a half bent position, and, after they had seized Mrs. Brown and the boy, said that they were officers. The witness had been living in the house about a year. Mrs. Brown had been there about a week when she was taken away. Witness was not at home when she took up quarters in his house. When he came home and found her there, she told him that the land on which the house was situated belonged to her. On the following Thursday, which was the Thursday before the tragedy, witness saw the relator and told him that, if Mrs. Brown remained there, he was going to hunt another home. The relator replied that he would get her out of the house if he had to kill her and drag her out. Witness told him, in reply, that if he killed her in that house he would not stay in it. Relator then asked wit-

ness the question direct: "If I kill her in the house will you re-main in it?" to which the witness replied that he would not.

The witness went from his house to the house occupied by Captain Van Houten, on the night of and but a short time be-fore the removal of the Browns from his house by the men.   He met the relator at said house, and, when he left to return home, the relator, with a bridle in his hand, walked with witness as far as Van Houten's lot.   On the way to the lot the witness re-marked to the relator, as it was late in the year, and the weather was getting cool, he would like to know something definite about the house, and whether he or Mrs. Brown was to retain it.   Re-lator replied to witness that Mrs. Brown would not be in the house much longer.   He then went on to the lot to catch his horse, and witness went on home.   Witness did not see the re-lator again until he saw him at East Bernard station, on the Saturday after the death of the Browns.   Captain Van Houten's house was about three quarters of a mile from the house occu-pied by witness and known as the James house.   Both of the masked men had something to say in the house.   The short man, who removed the boy, said that he was going to take him to the Wharton jail.   The witness did not recognize either of the two men.   The handkerchiefs with which they masked their faces, from the eyes down, were white, with dark colored bor-ders.   The handkerchiefs now exhibited to the witness are folded like those worn by the men, and looked to witness like the same handkerchiefs.   The men were in the house but a short time.

Cross examined, the witness said that he did not give Mrs. Brown permission to occupy the house.   He was living in the house at the time Mrs. Brown and her son were taken off by the men.   The witness was not willing for Mrs. Brown to occupy any part of the house, and he accordingly complained to the re-lator about her moving into and staying in the house.   Mr. Fitz-gerald and Mr. Odom arrested witness on the day after the mur-der, upon the charge of having committed the murder, and kept him in confinement for two days and two nights.   Fitzgerald and Odom told witness that he must tell what he knew.   The witness was somewhat alarmed, but told them nothing but the truth, as he has told it on this trial.   Fitzgerald and Odom did not threaten to hang the witness unless witness made some explana-tion of the disappearance of the Browns, but did threaten to send him to jail.   Witness first saw the handkerchiefs in evi-

dence at the station, where he was shown them by one of the officers who had him in charge. That officer asked witness if he had ever seen those handkerchiefs before, and witness told him that they looked just like the ones worn by the men who took the Browns off. Witness was released at East Bernard station, after making a truthful statement to the officers. He was not then notified to appear at this trial as a witness. The point at which the gin house men met the abductors was about thirty or thirty-five steps up the fence from the house. The witness did not go with the men who had the Browns any further than just outside the gate, which gate was about twenty steps from the front door. He met the gin house men just outside the gate, and they went into the house with him. The witness lived about three and a half miles distant from the house of justice of the peace, Fitzgerald. He owned a horse, saddle and bridle, but did not go to the house of either Fitzgerald or Odom to report the abduction of the Browns. He was afraid to go. He did not go to Van Houten's, nor give the alarm until next morning. The gin house hands remained at witness's house until after eleven o'clock, up to which time witness knew that they, gave no alarm. Van Houten came to the witness's house on the next morning and witness reported the transaction of the night before to him. Van Houten said that he would go and report the facts to the authorities. Van Houten said, when he reached witness's house on that morning, that Johnson Williams, one of the gin hands, who was at witness's house on the night before, had told him the officers had removed the Browns, and he wanted to know if it was true. Witness told him that it was true, and he, Van Houten, then put Mrs. Brown's things out of the house, and outside of the fence. He then remarked that the proper place for the officers to have taken the Browns, was the station, and that he would go and see about it. Before the abduction, the relator told the witness that Van Houten had filed a complaint against Mrs. Brown, and that he was looking for the officers to serve the papers on her at any time. Van Houten also told witness that he had filed a complaint against Mrs. Brown, and that she would be removed by the officers. When Van Houten came to witness's house on the morning after the abduction, witness told him that the abductors were white men, and that they had handkerchiefs on their faces.

Re-examined, the witness said that the masked men who came to his house and removed Mrs. Brown and her son represented

themselves to be officers, and one of them claimed the name of Jones. Witness was arrested before the bodies of the Browns were found. A number of persons, including several of the tenants of the relator, were arrested. Van Houten was a tenant of the relator, and had charge and supervision of the plantation. The witness believed the representation of the men that they were officers, and did not suspect foul play until Van Houten returned to the plantation from Wharton and told him that the Browns had not been taken to that place. On re-cross examination, the witness said that the parties took the Brown boy out at the back door. Mrs. Brown occupied the front room, the door of which opened to the gallery, in the direction of the gate. That door was closed. The witness reiterated that both of the men talked while in the house, but that he did not recognize either of them. The gin hands named by witness were recent "comers" from Fayette county. They had been on the plantation about a year.

Judy James, the wife of the preceding witness, was the next witness for the State. She testified that she was at home on the night and at the time of the abduction of Mrs. Brown and her son. The two men, masked with handkerchiefs, as stated by the first witness, and with pistols in their hands, rushed into the house through the back door of the kitchen and back room into Mrs. Brown's room. One of the men seized Mrs. Brown and the other seized the boy. Witness fled from the house, remained outside until she got over her fright, when she returned, and remarked to her husband that one of the men looked like Mr. Gallaher, the relator. Her husband replied that he "reckoned not." Witness became frightened again and left the house by the back door, through which the men entered, and went into the garden, where she remained until the men brought Mrs. Brown and her son out of the house. On their way to the gate with the Browns, the men passed within three steps of where the witness was sitting. As they passed out of the house, the man who had the boy asked him who built that house, and the boy replied that he did not know. When they got to the gate, the man who had Mrs. Brown said that his name was Jones. Mrs. Brown replied that she knew Mr. Jones, and that he was a nice man. The men told the Browns that they were going to take them to the Wharton jail. Mrs. Brown then begged, in vain, to be permitted to pass the night at the house, and then began to cry "murder!" About that time the men from the gin came running towards the

house. The two men very soon left with the Browns, and about an hour later the witness heard five shots fired from a point towards which the men took the woman and boy. There was a lighted lamp on the kitchen table when the men entered the house, and a fire was burning in Mrs. Brown's room.

The talking was done principally by the taller man. The men were nearly of a size. One of them talked in a coarse tone of voice, which witness thought was assumed. It was before she left the house that witness told her husband that the tall man looked like the relator. Witness's reason for supposing that the tall man was the relator was that he looked like him, and had on a light colored hat, such as the relator wore. Witness saw relator on that (Wednesday) morning. While the parties were at the gate, and just before they left, the Brown boy said that he knew he had done wrong, but begged that he be left at the house until morning. If that remark was in reply to a question asked by the men, the witness did not know and did not hear the question. Witness never saw Mrs. Brown or her son alive after the men left the house with them on Wednesday night, December 7, 1887, but, on the following Friday, December 9, saw Mrs. Brown's dead body on the prairie, at a point in the direction of which she and her son were taken on the preceding Wednesday night.

Cross examined, the witness said that she did not tell what she knew about the disappearance of the Browns at the time her husband was arrested. She did not tell of it until some parties came afterward and questioned her about it. She then told the said parties that two white men came to her house on Wednesday night and took the Browns away. Having pushed their way into the kitchen, the men went straight to Mrs. Brown's room without stopping. Witness thought the tall man was Mr. Gallaher, because she thought she recognized his movements, and also his eyes, which were not covered either by the hat or the handkerchief. The lighted tin lamp was on the table when the men entered the door, and the witness was sitting at the table facing the door. Witness's husband followed the men and the Browns to the gate, but witness, who was then in the yard, could not say that her husband did or did not open the gate for the parties. Davy, witness's husband, went to the gate with the man who had Mrs. Brown. They went rapidly. Henry Allen came to the house with the men and went with them, Davy and the Browns. He afterward went back into the

house with witness, Davy and the gin hands. The witness's daughter was at the gate at the time the men left with the Browns. Mrs. Brown's door was closed when the men came into the house. They ordered Henry Allen to open it, and when it was opened the two men ran into the room. One of them seized Mrs. Brown and the other seized the boy. Davy remained seated in the kitchen until the men found they could not remove the Browns unaided, when one of them said to Davy: "We deputize you to help take this woman out of the house." Davy and Allen then helped the men take the woman and the boy to the gate, when the men ordered them to help tie them on the horse or horses, which they did. The men then went off with the Browns. Grant Allen, Sewell Smith, Johnson Williams, Jim Harris and Ben Endy were the gin hands who met Davy and Henry Allen at the gate very soon after the men left with the Browns. They went into the house with Davy and Henry Allen and remained in Mrs. Brown's room until daylight. The several parties named as gin hands were employed at the relator's gin. All were "new comers" from Fayette county. They left witness's house together about daylight. Witness saw but one horse at the gate. She heard the men order the boy to get on the horse, and she knew that they made the woman walk.

Re-examined, the witness said that her reason for not reporting the abduction at once was that she was afraid to do so. She was afraid of the relator. She knew the relator well, and recognized him in one of the masked men who took the Browns away from the "Davy James house" on the night of Wednesday, December 7, 1887. The only threat the witness heard the men make while at the house was that if Davy did not help them get the woman out of the house they would kill the last person in the house. The relator was the first of the masked men to enter the house. Witness did not recognize the other man. When he seized Mrs. Brown, the relator said to her: "You have been in this house long enough." It was when he got to the gate with Mrs. Brown that the man who then had her said that he was Mr. Jones. The witness had never divulged her recognition of the relator before, because she was afraid to do so. Witness did not know whether or not the parties tied Mrs. Brown after they got her outside the gate, but she heard them order her husband to help tie her. Witness saw no rope. Mrs. Brown and the boy, when witness last saw them, were pulling back and begging to be released. Witness recognized the relator as the tall man

when he entered the house, and again when he stepped out of it with Mrs. Brown. The gin house hands were in witness's house when witness heard the five shots. The witness was absolutely positive that the taller of the two masked men was the relator. She recognized him by his voice, features and movements. She only knew that the other was a white man. The relator and Mrs. Brown both claimed the "Davy James house" and the land on which it was situated. Mrs. Brown, when she came into the house, told witness that the house and land belonged to her; that she was tired of Gallaher's control over it, and gave witness and Davy a specified time in which to move.

Re-cross examined, the witness said that she fled from the house into the garden because she was frightened. It was not too dark to see a horse, but was too dark to distinguish the features of a man outside of the house. No one but the sheriff had ever asked witness directly if Mr. Gallaher was one of the two masked men. When witness got to the back door, on her first return to the house from the garden, the men and Davy and Allen had Mrs. Brown and the boy, taking them out of the house. Witness's children, of whom Sallie Ann was seventeen years old, were then in the kitchen. The men kept the handkerchiefs on their faces all the time they were at the house. The handkerchiefs covered all of the face except the eyes and forehead— exposing enough to show that they were white men and not mulattoes. The trouser legs of each man were stuffed into his boot tops. The lamp was burning on the kitchen table when Mr. Gallaher rushed into the house through the kitchen, and it was then that witness first recognized him. She recognized Gallaher's voice when he said to Mrs. Brown: "You have been in here long enough." A great many people had questioned witness since she had been in attendance upon this trial, but she had told none of them that she recognized Mr. Gallaher as one of the masked parties. A number of these parties had told witness not to be afraid to tell that Gallaher was one of the men, and that, if he was, to tell it on the trial, and she would be protected. They further told her that, if she did not tell that Gallaher was one of the men, she might get her husband's neck broken. Mr. Fitzgerald told her that, as the Browns were taken from her husband's house, the danger to her husband was imminent, and that, unless she told that it was Gallaher who removed Mrs. Brown, her husband's neck would get broken. Witness was attached to her husband, with whom she had lived happily.

That consideration enabled her to overcome her fear and tell that she recognized Gallaher. Mr. Hannay and Judge Delaney had encouraged witness, with assurances of protection, to tell truthfully what she knew about this case, and witness has now told what she knew about it. The man who seized Mrs. Brown was the man whom witness took to be Gallaher. She did not positively know which of the two men it was who claimed to be Mr. Jones. Mrs. Brown was well acquainted with Gallaher when she was abducted, but was not on speaking terms with him. Captain Van Houten was the manager of Mr. Gallaher's plantation in Wharton county. Gallaher lived at Eagle Lake, in Colorado county. Gallaher was on the plantation, but did not visit the "Davy James house" while Mrs. Brown was there.

Re-examined, the witness stated that she saw Gallaher on his plantation several times during the week previous to the fatal Wednesday. She saw him ride off from the plantation on that morning. Mr. Fitzgerald told witness, when the bodies of the Browns were found, that, if she did not tell what she knew about the matter, her husband's neck was liable to get broken. He said that, the woman and boy having been taken from witness's house, she and her husband necessarily knew something about it. Neither Fitzgerald nor others ever told witness to say that Gallaher was one of the masked men. They told her, however, to tell *all* she knew about the matter, and that she would be protected. No person had tried to influence her to tell that the man she recognized was Gallaher, further than to tell who, if anybody, she recognized, and all she knew about the abduction. Witness swears that the man she recognized was Gallaher simply because she knew that man was Gallaher. If witness had stated on this trial that Mr. Fitzgerald either told or persuaded her to say that the man she recognized was Gallaher, she was mistaken. Fitzgerald only told her to truthfully tell *all* that she knew. Mr. Hannay, the district attorney, Judge Delaney and Judge Burkhart were the gentlemen who encouraged her with pledges of protection to tell truthfully what she knew about this transaction. Witness understood them to mean that she would be protected by the State.

J. W. Jones, sheriff of Wharton county, was the next witness for the State. He testified that he knew both Mrs. Brown and her son Mayo in their life time. Witness saw their dead bodies on December 9, 1887, on the prairie about three-quarters of a mile from the "Davy James house," and about a mile and a

quarter west from Gallaher's plantation residence, then occu-
pied by Captain Van Houten. Witness found Mrs. Brown's
body and somebody else found the body of the boy, the two
bodies being about eighty yards apart. Mr. Rives stepped the
distance. The two bodies lay about one hundred yards from an
old road not now in use. The body of Mrs. Brown lay back
down, and had the appearance of having been laid out. The
witness observed a bullet hole under the right eye. No over-
skirt was on the body, but witness found an overskirt at the
"Davy James house" which was said to belong to Mrs Brown,
and to have been found by some person about two hundred
yards from said house in the direction of the bodies. A large
crowd of men were present when the inquest on Mrs. Brown's
body was held (soon after it was found, and where found) by
Justice of the Peace Fitzgerald. Witness examined the body
of the boy. He had on a pair of new boots. A pistol ball had
broken one of his legs between the ankle and the knee, entering
from behind. Another ball penetrated his back, between the
shoulder blades. Witness thought that his head was crushed,
but was not positive about that. His hands were clasped. The
wound in the boy's back, and the wound in the woman's head
were sufficient, the witness thought, to produce death. Witness
did not examine the bodies for wounds other than those de-
scribed. Mrs. Brown was, the witness thought, between fifty
and fifty-five years old—somewhat older than her sister, Mrs.
Rader. She wore false teeth and had gray hair. The boy was
between fourteen and fifteen years of age and weighed between
one hundred and twenty-five and one hundred and thirty pounds.

Continuing, the witness testified that he was acquainted with
the relator, Gallaher. Mr. Gallaher did not call on witness
about his trouble with Mrs. Brown. Mrs. Brown told witness
that she had a deed to two-thirds of a league of land which was
claimed by Gallaher, and that her suit against Gallaher for
the land had been pending for about three years. Witness knew
Captain Van Houten, who lived in the main house on Galla-
her's plantation and had charge of that plantation. The "Davy
James house," from which Mrs. Brown and her son were said
to have been abducted on the night of December 7, was on the
Gallaher plantation. A few days before the said abduction,
Captain Van Houten came to the town of Wharton to swear
out a warrant for the arrest of Mrs. Brown, and asked witness
to serve the warrant. Witness told him to get the constable of

his beat to make that arrest. Mr. Fitzgerald, the justice of the peace of that precinct, who was present, remarked that Mr. Odom, his constable, was absent on a cow hunt. The witness then asked Van Houten what Mrs. Brown had done to render her arrest necessary. He replied that without his permission she had come to one of his houses, piled her "duds" in it, moved in and taken possession, and that when he went there to order her off she "made for" a six shooter. He did not tell witness that she drew the six shooter on him. He then remarked: "If the sheriff of Wharton county is afraid to get her out, let him deputize me (Van Houton) and I will get her out." Witness had no warrant for the arrest of Mrs. Brown.

Witness, taking Jack Rives, Bozie May and Mr. Barbee with him, went to Gallaher's plantation on Friday, December 9, 1887, to search for the bodies of Mrs. Brown and Mayo Brown. He had two reasons for going. The first was that on Thursday, the day before, at about four o'clock p. m., Captain Van Houten came to Wharton and told witness that the freedmen on the place informed him on that morning that two men, giving their names as Jones and Robinson, and claiming to be officers, forced their way into the "Davy James house" on the night before, and took Mrs. Brown and her son off, under the pretense that they were going to take them to jail; that, knowing Mrs. Brown had a case set for that day at East Bernard, he went there, but not finding her, he became suspicious of foul play, and that he wanted witness to go to the plantation and investigate the matter, as the disappearance of Mrs. Brown and her son might reflect upon him. He said that he was apprehensive of something wrong, because, if the men who took Mrs. Brown were, in fact, officers, they would in all probability have taken her either to East Bernard or to Wharton. Witness's other reason for going was that, at noon on that day, he received a telegram from Mrs. Rader, Mrs. Brown's sister, asking him if Mrs. Brown was in Wharton. Mrs. Rader lived at East Bernard. Van Houten's statement and Mrs. Rader's telegram satisfied witness that something was wrong, and he went to the Gallaher plantation, as stated, on the morning of Friday, December 9, 1887. It was about fourteen and a half miles from the town of Wharton to the place where the bodies of Mrs. Brown and her son were found. It was about one and a half miles from the latter place to the East Bernard, and about eleven miles from said place to New Philadelphia. When found on the said Friday morning,

the bodies of Mrs. Brown and her son appeared to have been dead about twenty-four hours or more. Upon finding the bodies the witness summoned all the negroes in the neighborhood to view them. He did not see Captain Van Houten on that morning, but was told that he was at the station. Witness then went to the plantation residence and arrested a man named DeWitt, whom he soon released, satisfied that DeWitt knew nothing about the murder. DeWitt was very kind to witness, and willingly afforded him every facility in searching the house. Witness searched the house and found two pocket handkerchiefs hanging on separate nails in Captain Van Houten's room, folded in the peculiar manner in which they were first offered in evidence. Witness smoothed those handkerchiefs out, looked at them, and then placed them in his pocket, and afterwards turned them over to Justice Fitzgerald. The handkerchiefs found by witness in Van Houten's room were the hankerchiefs now in evidence. Upon the discovery of the handkerchiefs in the room it was decided to arrest Van Houten. Boseman arrested him in Wharton on Saturday night.

Gallaher was arrested on Saturday morning at Eagle Lake, by Mr. Stewart. Witness procured a capias for the arrest of Gallaher on Friday night, and he and a deputy got to Eagle Lake before daylight on the next morning. They found a store and a saloon open, and went into the saloon and asked for an officer. Constable Stewart was soon found, and witness delivered the capias to him to be executed. Stewart went off and came back without Gallaher, but said that Gallaher would soon report. Gallaher arrived within a short while, and witness took charge of him. Witness observed a fresh wound on Gallaher's right wrist. He did not think that wound was made by a sharp instrument. Gallaher called witness's attention to it by getting some medicine to put on it. The wound was raw, but was not bleeding. Witness was collector of taxes as well as sheriff of Wharton county, and knew Gallaher well. Gallaher was considered and reputed to be a man of wealth. He was a tall man, measuring at least six feet in height. He usually wore a large white hat, and generally wore his trousers with the legs stuffed into his boot tops. When the witness took charge of Gallaher he said to him: "Well, I suppose you are aware that I came here after you?" Gallaher replied: "Yes, but I want you to let Johnny Stewart go with me, as I don't want the East Bernard mob to get hold of me." Witness assured him that he was in

no danger of a mob, and that he (witness) would protect him as long as he was in witness's custody and witness was alive. Gallaher replied that he had no fears as long as he was in witness's custody, but that he feared for himself as soon as he should be turned loose at East Bernard. Gallaher's first inquiry was: "Have you got Captain Van Houten?"

Cross examined, the witness stated that when he delivered the capias to Stewart and sent him to arrest Gallaher, he told said Stewart that Van Houten had already been arrested. Witness thought that Gallaher had some enemies at East Bernard. Gallaher was a cattle man, and, as most cattle men do, generally wore his trousers with the legs stuffed in his boot tops. The hat worn by Gallaher was of the kind worn by most cattle men. The witness made his preparations to go to Eagle Lake and arrest Gallaher before he got information from the Bernard, but hastened his departure when he received from Mr. Fitzgerald the following letter:

East Bernard, Texas, 7:40 p. m.

*To J. W. Jones, Sheriff Wharton Co.:*

Dear Wyatt—Your letter in regard to Mrs. Brown just received. From what I have seen, I think it is a terrible, cold blooded, premeditated murder, both of Mrs. Brown and her son, and that Jim Gallaher and Van Houten are the murderers. Come at once and help me to protect our county.

Tod Fitzgerald,

Justice of the Peace, Wharton Co., Dec. 8, '87.

It was the recollection of the witness that Van Houten, when he applied to witness to serve a warrant on Mrs. Brown, said to him that, if deputized himself, and clothed with proper authority, he could protect his property. It was about two o'clock in the afternoon, or perhaps later, on the evening of December 9 (Friday), when witness and his posse found the bodies of Mrs. Brown and her son. The point where Mrs. Brown's body was found was about three hundred yards from the southwest corner of Gallaher's field fence. The boy's body lay about eighty yards north from that of his mother. The witness did not examine for foot tracks about the body of Mrs. Brown. He, however, saw a rather small boot or shoe track near the boy's body. Witness did not think that any person had been about the bodies between the times the murders were committed and

the bodies discovered. The "Davy James house," from which the Browns were taken, was on a line between Gallaher's gin house and the point where the bodies were found. Davy James's wife was the first person who, in answer to questions, indicated the direction from which the reports of the pistols were heard. The witness observed no wearing apparel at the James house except the dress skirt which they told him was found about two hundred yards distant from the house. At a point between fifty and a hundred yards from the body of Mrs. Brown, the witness found a piece of rope, which looked like it had been tied in the mouth and afterwards cut. He did not examine Mrs. Brown's mouth nor the mouth of the boy. Witness did not summon a physician, nor did he know of any being called to examine the bodies. From appearances, the witness thought that Mrs. Brown was standing on her feet when her throat was cut. The blood had flowed from her throat to her breast. The witness saw one track—the track of a large box-toed boot or shoe— pointing from the bodies towards the Davy James house. The Davy James house stood about one hundred feet from the road. Witness examined no house but that of Captain Van Houten. It was his belief that Mr. Barbee searched the Davy James house. A number of his posse searched the house of Andrew Collins, and found a shirt, a pair of boots and one hundred and fifteen dollars in currency and silver, which articles were still in the possession of the witness. Witness did not observe any blood on the shirt, but did not examine it. The handkerchiefs found in Captain Van Houten's house were neatly folded. If either of them was soiled with blood or liniment, witness did not detect it. The handkerchiefs found in Van Houten's room were white cotton fabrics, with dark blue borders. Barbee, May and Odom were with witness when he found the handkerchiefs. He found them late on the evening of Friday, December 9, 1887. The rope found by witness near the body of Mrs. Brown was long enough to reach around Mrs. Brown's head if her mouth was open. There was no blood on the piece of rope found by witness. Witness did not examine the inside of the Davy James house. Van Houten was a brother-in-law of Gallaher. The parties separated after the bodies were found. Some went with the bodies to the station, and May, Barbee and others remained on the ground hunting for evidence. Mrs. Brown's hair was brown mixed with gray.

J. G. Barbee testified, for the State, that he was not acquainted

with Mrs. Brown, but that on Thursday evening, December 8, 1887, the sheriff summoned him to help search for the bodies of Mrs. Brown and her son, who were supposed to have been murdered. The sheriff came by witness's house early on Friday morning, and they repaired to the Gallaher plantation. Just before reaching East Bernard they met Mr. Fitzgerald and others, and went to the Davy James house to begin the search. After searching the creek bottom, up and down, for a short distance, they went to the Gallaher gin and learned from the gin hands what they knew about the disappearance of the woman and the boy. Witness then proposed that the party return to the house and interrogate Judy James, the old negro woman. The entire crowd went back to the James house, and while they were there Mr. Mint Gallaher and another gentleman drove up in a buggy. The old negro woman (Judy James) at first gave no information to the party. Witness then asked the old woman to go around the house with him. When he got her away from the crowd he told her that indications pointed to the perpetration of a fearful crime, and that, as Mrs. Brown and her son when last known to be alive were in her house, suspicion would probably rest upon her, and that, if she knew anything about it, she had better tell it at once. The woman then indicated a point of timber west from her house and said: "They are over there somewhere"—that soon after the Browns were taken from her house she heard five shots fired in that direction. Witness and the sheriff's party then went to the point indicated by the woman, and found the bodies. Witness and sheriff Jones were riding together in advance of the other ten or fifteen members of the party. Jones first discovered and pointed out the body of the woman. Captain Van Houten was not a member of the sheriff's posse, and witness did not see him at all during the investigation. Witness was nearest Van Houten's house before finding the bodies when he was at the gin. Fitzgerald took charge of the bodies and sent them to the station. After the bodies were found, the witness, sheriff Jones, Mr. May and Mr. Rives went to the plantation house to arrest Captain Van Houten, but did not find him. They searched Van Houten's room, and found two neatly folded handkerchiefs—the ones in evidence—hanging on some nails against the wall. They searched the house of Andrew Collins on the next morning—Saturday—and found a pair of boots, a shirt and some money. The money was found in a trunk. The shirt mentioned had

blood on it, and was in a pile of soiled clothes on the gallery near which Collins's wife was washing. The boots appeared to have been worn a day or two before, and to have passed through grass that was wet with dew. A quantity of crap grass seed was adhering to the boots, and on second examination witness found a sprig of grass clinging to one of them. Fitzgerald took one of the boots and witness the other, and they started out to see if they would fit any of the tracks previously discovered.

They went first to a small lot or pasture, in which, near the fence, witness found a foot track, to which he applied the boot, and found it to correspond with the track. The boot (now in evidence) had a half sole and a run down heel. The track referred to was about one hundred and fifty yards from Collins's house. Witness discovered two tracks in a little pasture near Collins's house. One, he was satisfied, was made by the boot in evidence, as the said boot fitted it to a nicety. The other track was that of a small boot or shoe. It left the pasture through the bars, about one hundred yards south of Collins's house, and about seventy-five yards from the large track of the half soled boot. Witness found a different track in the field, which went south to a point within a hundred and twenty-five or a hundred and fifty yards of the Davy James house. The person who made that track appeared to have stopped and remained at the point indicated for some time. From that point the track went south about two hundred and fifty yards to the fence. The man who made that track stopped at a point about one hundred yards from the south fence of the field. The impression was that of a seven and a half or eight boot or shoe. Witness could find no track outside of the field, but found one following the fence from the west. The trail of that track commenced about two hundred and fifty yards from the corner of the fence, went east, and appeared to be a different track from that followed by witness just before. The field mentioned was in cultivation, but the land west of it was not. Witness made a close examination of but one track found outside the field, and that was the track he found near the boy's body—about twelve inches from the boy's feet. That impression, he believed, was made by a number six shop made boot—the heel being smaller than a shoe heel. Witness also found the track of a horse, shod all around, at and near the bodies. That track led north from Mrs. Brown's body to within six or eight feet of the boy's body. The track indicated that the horse traveled in a gallop. Witness saw, but did not

examine, a human track larger than the small heeled boot track, which approached to within two feet of the dead boy's body.

Recurring to the horse track, the witness said: "I saw the track of the same horse in the road passing the same point not very far from David James's house, and going west; then turning and following in the road some four hundred yards to a point southwest from where the bodies lay; then turning northwest along the road to some houses about eight hundred yards northwest and near the pasture gate. I saw the same tracks coming back on the road. I then saw the same horse track in a little pasture near Collins's house. I could not discover the track where it went away from the body of the boy." The ground westward from the Davy James house was level, and was covered with grass from ten to eighteen inches high. The shirt found among the soiled clothes on Collins's gallery had blood on both sleeves, ranging from the wristband to the shoulder. There was blood on the right sleeve where it fits into the pit of the arm. The blood at that place appeared to have been smeared on, while that at the other parts appeared to have spurted on. The blood on the shirt was still distinct, and when the shirt was found it looked like it had been bloodied not more than forty-eight hours before.

A lady's hair was found on the right shoulder of the shirt. It was about three inches long and was partly split. It was the hair of a white lady. It was, the witness thought, brown in color, but being split, the witness could not be positive as to the color. Witness could readily distinguish a white lady's single hair, three inches long, from the single hair of a bright mulatto of the same length; and he could, in nine hundred and ninety-nine cases out of a thousand, distinguish the single hair of a white lady from the single hair of a white gentleman, if each were three inches long, and split in the manner the hair found on the shirt was split. Witness wrapped the hair described in a paper and gave it to Mr. Odom. Mayo Brown's hat was found on the ground six or eight feet from the body of his mother. The boots exhibited were the boots found in Collins's house. They were soiled wih cow dung on the tops and sides, and appeared to have been worn in a stock pen. The sprig of prairie grass, an eighth of an inch being visible, is still adhering to the sole of one of the boots. Witness applied the boot now handed to him to several of the tracks, but it satisfactorily fitted but one—the one found inside of Collins's pasture. The shirt was

lying on the gallery with other soiled clothes when found, and was not concealed. Collins was not at home when the shirt was found. Witness never afterwards showed the shirt to Collins, nor did Collins ever explain, or have a chance to explain how the blood came on the shirt. Collins's wife, however, did make an explanation about it. Witness did not examine the Davy James house with a view of ascertaining whether or not it was entered by violence on the night of December 7. The kitchen of that house was covered by a platform and was small—not exceeding twelve by fourteen feet in size. It was not necessary to pass through that kitchen to reach the front room from which the negroes said Mrs. Brown and her son were taken. One side of the platform was open, and a person could step from that platform direct into the front room, through the door which opened on the platform. Parties going through the kitchen into the front room would have to pass through two kitchen doors and cross the platform. "The road I referred to as the one on which I saw the horse tracks was a sort of farm road which led from the gin house and the settlements in the bend, by two houses, through the west gate of the small pasture and to or near the north gate of the large pasture, through which gate the Wharton road passes. I saw no horse tracks like those described going from the road to David James's, but there had been a great deal of travel over the road, and nearly all of the posse passed over that route ahead of me."

Tod Fitzgerald testified for the State, that he was the justice of the peace of precinct No. 4, of Wharton county, and as such held the inquest upon the bodies of Mrs. Brown and her son, on the night of Friday, December 9. He turned the bodies over to Mrs. Rader at East Bernard. The witness began searching for the bodies of the Browns on the night of Thursday, December 8. On that night he and Odom and J. B. Britt went to the house of Davy James and arrested him, and at the same time arrested Henry Allen and Captain Van Houten, all of whom they took to East Bernard, and held there over night. On the next morning witness released Van Houten on a five hundred dollar bond, and Henry Allen on a two hundred dollar bond, and kept Davy James in custody. On Friday morning, December 9, the witness, en route to the Davy James house, met and joined Sheriff Jones and his posse. The party then divided into two squads, both squads beginning the search at the James house. The witness and his party found in the field, about thirty steps west

from the James yard fence, two tracks made by different persons. One was a large track, and was made by a number ten boot. The other was about a number six. Those tracks were trailed across a corn field to the point where the corn and cotton rows met. The big track followed the first cotton row, and the small track the corn row towards the creek. The witness applied one of the boots taken from Collins's house to one of the tracks mentioned, but does not state whether it fitted or not. He saw another track about fifty yards from the bars south of Collins's house, to which he applied the boot, and found it to fit exactly. He saw a number seven track about seventy-five yards west from where he found the first two tracks mentioned. The only track witness found after leaving the bodies was outside of the field at the southwest corner, and that track looked very much like the track which the boot fitted. After going down the fence about one hundred yards, witness and Barbee again crossed into the field and found the two tracks going towards the Davy James house. They trailed those tracks to within thirty steps of the yard fence. On the Saturday before the fatal Wednesday, Captain Van Houten came to the witness and filed a complaint against Mrs. Brown for carrying a pistol. The witness understood that Mrs Brown and her son moved into and took possession of the Davy James house about three days before that complaint was filed by Van Houten. The said Davy James house was situated on the Slaughter league of land. Mrs. Brown told witness that she owned the Davy James house, and in April, 1885, she told him that she had instituted suit against the relator, Gallaher, for a part of the land included in the Slaughter league. Mrs. Brown resided in the East Bernard neighborhood during the last six or eight months of her life.

Cross examined, the witness said that he fitted one of the boots taken from Collins's house to the first track found by him and Barbee after leaving Collins's house, and the boot fitted that track to perfection. The boot was applied to the track in the presence of Barbee. Barbee trailed the number seven boot in a westerly direction, and witness trailed the big track to a point within thirty steps of the fence around the Davy James house. While following the south line of the fence in a westerly direction, the witness found a track near that line of the fence which the boot fitted perfectly. He did not remember whether or not Barbee saw that track. Witness followed and examined the large track until he became satisfied in his own mind that he

had in his hand the boot by which the same was made. The several tracks described were discovered and examined on Friday, December 9, about noon. Witness did not know when nor by whom those tracks were made. He knew that it was the practice of plantation negroes in Texas to visit each other often, sometimes on foot, and at other times on horseback and in wagons. He saw about six negro hands grinding corn on Gallaher's plantation on Saturday, December 10. "The two tracks to which I refer as having been followed by Barbee and myself, and to one of which I applied the boot, were inside of the field, leading from the direction of the southwest corner of the field, easterly, and passing within thirty yards of the Davy James house, then turning north across the field, where I frequently applied the boot to one of the tracks as it went across. The track I speak of as being followed by Mr. Barbee, west of me, was coming across the field in a southerly direction. The track that accompanied the large one was smaller than the one Mr. Barbee followed."

The body of Mrs. Brown, when found, was lying on the back. There was some blood on the breast, and blood had run down under the collar. The witness saw no blood on the ground near her body, nor any evidence on the ground of a struggle. He did not examine the dead woman's wrists, nor did he see any indication that she had been tied or gagged. Her hair was disarranged, and her tucking comb was lying on the ground near her head. She was stretched straight, her right hand lying on the ground by her side, and her left hand clutching her clothing. She had on no dress skirt, but wore a dark colored sacque, one sleeve of which was torn, as if by gripping or wrenching. Witness went to and examined the Davy Jones premises, but saw nothing to indicate that the room of Mrs. Brown was entered by force, or that the murder was committed in the house. Witness's first information of the disappearance of Mrs. Brown and her son, was obtained from Captain Van Houten. He came to witness's house about eight o'clock on Thursday morning, and asked witness if he had yet had Mrs. Brown arrested. Witness replied that he had not, but had written out the warrant for her arrest for carrying a pistol, and would have it served on that day. Van Houten then said that he had learned from the negroes that two men, representing themselves to be two officers, named Jones and Robinson, came to the James house on the night before and took Mrs. Brown off, and that he would hurry to

Wharton, as she might get a trial on the pistol case and leave him with costs to pay. Witness replied to Van Houten that there could be no costs in a criminal case except against the party convicted, and that he, witness, did not believe that Sheriff Jones had gone to the James house and made the arrest, as he was in Wharton himself on the day before and saw Mr. Jones. Neither the witness nor any physician, so far as he knew, examined the wounds on the body of the boy by probing. Witness had often, within the two months preceding the killing of the Browns, seen Gallaher at East Bernard. Gallaher lived at Eagle Lake, Colorado county. Witness ·did not, at any time during the search for the bodies, see Mr. Gallaher.

J. B. Britt testified, for the State, that he knew Gallaher, and knew Mrs. Brown in her life time. He knew that a law suit had been pending between Gallaher and Mrs. Brown for some time, and that Gallaher and Mrs. Brown were very unfriendly at the time of the latter's death. Witness knew of no horse in the Gallaher neighborhood that was shod all around except Gallaher's certain gray horse.

Cross examined, this witness said that he wore a broad brimmed white hat. He also wore a number five, shop made, small heeled boot, and always tucked his trouser legs into the boot tops. His trousers were made of brown and gray mixed cloth. Re-examined, he said that he saw Mrs. Brown on Wednesday—on the night of which day she is supposed to have been killed. Witness was at the James house when he saw her. He went there on his unshod bay mare. He went off from that house through Gallaher's pasture gate, over the old road leading west; thence through the gate of the first pasture, by a house, into the Wharton road. He rode in a walk and trot.

Mrs. P. D. Spivey testified, for the State, that she examined Mrs. Brown's dead body on Saturday morning, December 10. A shot entered the head from behind and lodged in front. Another entered in front, under the eye, and the throat was cut. In a pocket, detached from the skirts, and attached to the waist by a string, witness found a purse containing six dollars, and seven dollars and a half in silver were found loose in the pocket. The face was badly powder burned.

C. W. Brooks, testifying for the State, described the wounds on the two bodies substantially as they were described by previous witnesses, and stated further that, before the removal of the bodies from where they were found to East Bernard station;

he suggested to Justice of the Peace Fitzgerald the propriety of organizing a jury and holding an inquest. Fitzgerald and Jones replied that it was not necessary, under the new law, to organize a jury for the purpose of holding an inquest, and Fitzgerald added that his verdict was already determined upon.

P. M. Britt testified, for the State, that in October or November, 1887, Captain Van Houten, in talking to him, said that if Mrs. Brown came on the place, interfering with his business, he would treat her as a man and hurt her.

David James, recalled by the State, testified that he owned two vicious dogs, the white spotted one the more vicious of the two. When witness saw Mr. Gallaher on Wednesday he told witness to tie that dog and keep him tied. When witness got home, which was about an hour before Mrs. Brown and her son were taken away, he found that the white spotted dog had followed his daughter to Henry Allen's house. Witness told his wife about Gallaher's order to keep the dog tied. Henry Allen came to the witness's house with the two masked men, and came into the house in advance of them. Allen passed directly through the kitchen to Mrs. Brown's room, followed by the two men, who, when Allen opened Mrs. Brown's door, "bulged" past him into the room. Allen then helped the tall man take Mrs. Brown out of the house, and the other man, who was struggling with the boy, called to witness: "Old man, if you, or some of you, don't come and help get this boy out of here, I will kill the last d—d one of you in the house." That man had his pistol in his hand, and repeated his order three times, when witness obeyed and helped him take the boy out to the gate. The boy was tied while the parties were in the kitchen door, on their way out. They then took him to the gate bare headed, and sent the witness back into the house after his hat.

Henry Allen testified, for the State, that he lived on the Gallaher place, which was in Van Houten's charge, and in a house about one hundred yards from the Davy James house. Two gentlemen came to witness's house early on the night of December 7, 1887, and hailed. Witness went to the door, and asked what was wanted. One of them replied: "I deputize you to go down and help take Mrs. Brown." The men then marched the witness in front of them to Davy James's house. On the way to that house they met Davy James's girls with the white dog. The men marched witness into Davy's house, through the kitchen to Mrs. Brown's room, the door of which was closed. Witness,

as ordered by the men, called to Mrs. Brown, and she came to the door. As ordered, the witness pulled the door open, when the tall man grabbed Mrs. Brown. The other man caught the boy. While struggling with the men Mrs. Brown bit one of them on the wrist. The man then said (to witness): "God d—n you, can't you hold her?" They then made witness help the taller of the two men take Mrs. Brown to the gate, and Davy James help the other man take the boy to the same place. They then tied the Browns, put the boy on the horse and told witness and Davy that, as they had no further use for them, they could go back into the house. The tall man said that his name was Jones. Mrs. Brown said that she knew Mr. Jones, who was a nice man, and began to beg to be allowed to stay at the James house until morning. The tall man replied to her: "No, I am going to take you to Wharton before morning." They then went off with the Browns, and about thirty minutes later the witness heard four or five shots fired, at about the place where the bodies were afterwards found. The tall man who took Mrs. Brown out of the house was a white man. He had on a coat and hat just like the coat and hat of Mr. Gallaher. He was as tall as Mr. Gallaher, and walked like him, and when witness was called at his house he thought he recognized Mr. Gallaher's voice, and went to the door because he thought it was Mr. Gallaher who called him. The two men had handkerchief masks on their faces, but witness knew that the tall man, whom he helped to take Mrs. Brown out of the house, was a white man.

John B. DeWitt was the first witness for the relator. He testified that he lived in the main house on Captain Gallaher's plantation. Captain Van Houten, Gallaher's manager and agent, occupied part of that house and boarded with the witness. The mill hands took their meals at the house. The witness got home at sunset on the evening of Wednesday, December 7, 1887, and remained at home throughout that night. Captain Van Houten ate supper at the house on that night, and remained at the house from that time until the next morning. As soon as supper was over, the witness went into Van Houten's room to consult him about getting lumber with which to finish a house the witness was then building on the plantation for Captain Gallaher. After talking for some time about the work on the place, Van Houten proposed that the witness should get his violin and play on it awhile. Witness got his violin, brought his children into Van Houten's room and played for a considerable

time. His wife came into the room after she finished cleaning up, and Van Houten asked her to sing a song. She pleaded a headache, declined, and soon retired to her room. Witness then handed his violin to Van Houten and requested him to play a tune. Van Houten took the violin and "sawed" awhile, when witness, observing that it was ten o'clock, left the room with his children and went to bed. Van Houten began to take off his clothes before witness left the room. About fifteen minutes after the witness went to bed, his little son asked for some water, and witness got up to get it. The bucket of water was hanging on the gallery at Captain Van Houten's door. While getting the water the witness heard Van Houten coughing in his room. He knew as a matter of fact that Van Houten was then in his room. The witness could not remember what day it was that Captain Gallaher came to the plantation in December, 1887, but it was four or five days previous to the fatal Wednesday. On one of those days Gallaher left the house to repair the pasture fence. He went several times to Kendleton to sell cotton received by him from different renters on the place. He went twice to the house that witness was building. He left the plantation early on the morning of Wednesday, December 7, 1887, and witness did not see him again until he saw him in Wharton. The house being built by witness in December, 1887, was west— perhaps a little north of west—from the Davy James house. Two roads led from the plantation house to the unfinished house on which witness was at work. The one was known as the main road which was the traveled road, and the other as the old or dim road, which was the abandoned one. The latter road passed the gin house and the James house, and led thence, over a trail, northwesterly towards the corner of the field, and it was the road always traveled by witness in going to and from his work, it being much shorter than the main road.

Cross examined, the witness said he moved to Wharton county from Caldwell county in October, 1887. He moved into the Gallaher house on the eighteenth day of October, and has since leased land for another year. When he first came into the county he stopped at Foote's gin, near the Purviance, where he had a half-brother. His first arrangement was to rent land on the Purviance place, but, as he could not get teams with it, he gave up the lease, and rented land from Captain Gallaher through Captain Van Houten.

Re-examined, the witness said that a beef was killed on the

plantation, by order of Captain Gallaher, either on Monday or Tuesday before the fatal Wednesday. Mr. Gallaher, Andrew Collins and the other hands killed it. The witness himself cut up and salted down one of the quarters.

Mrs. Charlotte A. DeWitt, the wife of the previous witness, testified, for the relator, that Captain Gallaher came to the plantation about a week before the murder of the Browns, and during that time rode about the place every day, mending fences, etc. He and Andrew Collins and other hands killed a beef on Monday evening. The meat was brought to the house in a wagon. Captain Gallaher left the plantation early on Wednesday morning, December 7, 1887, since when witness had not seen him until to-day. There were four gentlemen in the party which came to the house on Friday evening and got the handkerchiefs. Captain Gallaher slept in the room with Captain Van Houten during the week of his stay in December, as he always did on visiting the plantation.

W. H. Anders testified, for the relator, that he lived in the town of Egypt, Wharton county. He had a slight acquaintance with Captain Gallaher. At about twelve o'clock m., on Wednesday, December 7, 1887, the witness saw Captain Gallaher on the depot platform at New Philadelphia. Witness was standing in the depot door, talking to Rhody Cooper, when Captain Gallaher rode up and dismounted. He spoke to Cooper and witness, and, after some talk, Cooper remarked that it was twelve o'clock, and invited witness and Gallaher to go home with him to dinner. Gallaher accepted the invitation and went off with Cooper. Witness declined and went home.

John Luke testified, for the relator, that he lived at New Philadelphia. He knew Gallaher, and saw him near the depot in New Philadelphia, at or about noon on Wednesday, December 7, 1887. He was with Rhody Cooper, and stopped witness and paid him ten cents that he owed witness. Cooper and Gallaher were on horseback, going towards Cooper's house. Cooper lived a little more than a half mile from witness's house, more in the direction of Frazier's store than Spanish Camp.

Dick Duboy testified, for the relator, that he lived at New Philadelphia, in Wharton county, about a half mile from the depot, and about two hundred yards from Rhody Cooper's house. Witness's and Cooper's houses were on the open prairie, in plain unobstructed view of each other. Witness knew the location of Captain Gallaher's plantation on the East Barnard.

It was between twelve and fourteen miles from Cooper's house to Gallaher's said plantation. The witness saw Captain Gallaher at the New Philadelphia depot on Wednesday, December, 7, 1887. He reached the depot about eleven o'clock. He left the depot with Rhody Cooper about twelve o'clock in response to Cooper's invitation to go home to dinner with him. Witness and Anders were together when Gallaher and Cooper left, going to Cooper's house. Cooper's invitation to dinner included Mr. Anders, and Anders excused himself. Witness left the depot a short time after Gallaher and Cooper did, and when he reached home he saw Gallaher watering his horse at Cooper's well. After watering the horses, Gallaher and Cooper went into Cooper's house together. At about three o'clock the witness saw Gallaher and Cooper leave Cooper's house and ride out on the prairie together. They went in the direction of the Colorado timber, a little above Frazier's and between Frazier's and Eagle Lake. The witness saw them several times after that on that evening, riding through the cattle on the prairie. They returned to Cooper's house about sun down on that evening, watered their horses, took their horses to the lot, and went back to Cooper's house. Witness saw nothing more of either Cooper or Gallaher on that night, but between eight and nine o'clock on the next morning, Thursday, witness saw Gallaher leave Cooper's house and ride off towards Eagle Lake. Gallaher was riding a gray horse.

Richard Moore testified, for the relator, that he lived at New Philadelphia, about a half a mile from the depot, and about two hundred yards from Rhody Cooper's house. Cooper's house was within plain, unobstructed view from witness's house. About noon on Wednesday, December 7, 1887, the witness saw Gallaher and Cooper ride past his house to the said Cooper's house, where they dismounted and went in. He saw them again about fifteen minutes before sun down on the same evening. They were then about half a mile from Cooper's house, riding through cattle, and going towards Cooper's house. Witness was then going to the lake, and was on the opposite side of the creek from Gallaher and Cooper—about one hundred and fifty yards from them. They were then west from Cooper's house, towards the Colorado timber. Witness went on to Eagle Lake, and saw nothing more of Gallaher or Cooper on that night. Witness returned to his home that night at about eight o'clock, and between eight and nine o'clock on the next morning he saw Gallaher leave Cooper's house and ride off towards Eagle Lake.

Statement of the case.

Louis Busch was the next witness for the relator. He testified that he was in the employ of Rhody Cooper, aad lived at Cooper's house, which was situated in Wharton county, about a mile distant from New Philadelphia. He knew Captain Gallaher, and knew the Gallaher plantation on the East Bernard. It was called fourteen miles from Cooper's house to Gallaher's said plantation. Witness saw Gallaher on Wednesday, December 7, 1887. Witness got home from the Middle Bernard after dinner, when Mrs. Cooper told him that Mr. Cooper and Captain Gallaher had waited at the house above an hour for him, and then rode off on the prairie. Witness then saw them out on the prairie in the direction of Colorado timber, riding about among the cattle. This was about three o'clock, as near as witness could guess at it. Witness did not observe them again until between sun down and dark, when they rode up to the house. Gallaher got down and opened the gate, and he and Cooper rode into the yard, watered their horses and then took them to the lot and fed them. They then went into Cooper's house. Witness went to bed at about nine o'clock, and he knew that Gallaher was at Cooper's house at that time, and had been at the house since after sun down and before dark, and had been in the neighborhood since three o'clock in the evening. Witness got up next morning at four o'clock. Gallaher was then in Cooper's house. Witness saw him lying in bed with Mr. Cooper. He left Cooper's house between eight and nine o'clock on that (Thursday) morning and went in the direction of Eagle Lake.

Cross examined, the witness said that he had lived with Mr. Cooper about three weeks. He milked the cows and fed the stock on Wednesday evening, December 7, between sun set and the time he went to bed. He ate his supper before he milked the cows. Witness worked for Oll Dellno, Cass Adams and Will Good before he entered the service of Rhody Cooper. He frequently saw Captain Gallaher shipping during the summer of 1887. Cooper's house had four rooms. The witness occupied one of the rooms up stairs, sleeping on a mattress. Gallaher and Cooper slept together on a mattress on the floor of the room down stairs, in which Mrs. Cooper and her little boy, occupying a bed, slept. No other bedstead than that occupied by Mrs. Cooper and her little boy was in that room. There was no bedstead in the room occupied by witness. Mrs. Cooper's mother slept in the other down stairs room, in a bed, and Mr. Cooper's three children slept in the other bed that was in that room. Ike

Railey, a half witted or idiotic employe of Mr. Cooper, slept on a pallet in the second up stairs room. Ike Railey got up on Thursday morning before the witness did. He made fires and did other chores. Witness had to pass through Mr. and Mrs. Cooper's room to get from his room out of the house. He saw Gallaher in the pallet with Cooper when he passed through the room at four o'clock on that morning. Witness fed the cows, shucked the corn and fed the horses on that morning. After that he went back into the kitchen to get the milk bucket. Ike Railey, who was then in the kitchen, went with him to the cow lot and "kept the calves off" while he milked. There was no fire in Mr. Cooper's room, in which Gallaher slept, when witness passed through that room on Thursday morning, but Ike Railey had a lamp light in that room. Gallaher got up about three quarters of an hour after the witness did. Mr. Cooper got up when breakfast was served, and that was, to the best recollection of the witness, after sunrise. Mrs. Cooper got up while witness was at the lot feeding, and was in the kitchen cooking breakfast when witness went back to get the milk bucket. Gallaher fed his own horse on Thursday morning. He remained at Cooper's house quite a while after breakfast, and left about nine o'clock.

Witness stated that he had been in Wharton (where this trial was being had) more than a week. He came in a hack with Mr. Cooper to open gates, Cooper being a one legged man. Witness had never been subpœnaed in this case, but a man came to witness at Doctor Phillips's drug store and took his name as a witness. Witness had been staying at Mr. Stagley's boarding house with Mr. Cooper and a large number of other boarders. Witness was working for Mr. Cooper for fifteen dollars per month. He was unable to say whether or not he would be allowed wages by Mr. Cooper for the time lost on this trial. Witness did not expect Mr. Stagley to board him for nothing. He did not know who, if anybody, expected to pay Stagley for his board, but expected to do so himself. The witness had not been notified that his board would be paid by anybody. He had no personal interest in the case, and had not been paid nor promised any payment for testifying in this case. Witness knew Stagley before he came here, but Stagley had not told witness that he was boarding him for nothing. Cooper had not told witness that his board and expenses would be paid. Witness had talked with several parties besides Major Dennis, the attorney for the re-

lator, and Mr. Parker about this case. He had talked to George Stagley and Doctor Phillips about it. The witness was a single man, nineteen years old. Mr. Cooper has a cork leg at home, but does not wear it. Witness and Cooper went home on the Saturday evening prior to this trial and came back on Monday. Ike Railey was not in attendance upon court. Witness was unable to say whether or not Cooper was paying Railey anything for his services.

J. C. Cooper testified, for the relator, that he was generally known by his nick name "Rhody." He lived at New Philadelphia, Wharton county, about three-quarters of a mile southwest from the depot. He came to Wharton county in 1867. Witness knew where Gallaher's plantation on the East Bernard was situated. It was fourteen miles from the witness's house to Gallaher's plantation. Witness had known Captain Gallaher since 1868. The witness went to New Philadelphia on Wednesday, December 7, 1887, to get his mail. While he was standing in the depot, Captain Gallaher rode up, got off his horse, went into the depot and said something to the freight agent about shipping cattle. When he came out, the witness invited him and Mr. Anders to go with him to his house for dinner. Mr. Anders declined the invitation, but Captain Gallaher accepted it and left the depot with witness. They met Johnny Luke on their way home, and Gallaher paid Luke a small piece of money he owed him. On reaching witness's house, Gallaher watered the horses and then fed them. Witness and Gallaher then went to the house, and, after waiting some time, dinner was served. They then went to the gallery, sat down and got into a conversation about the cattle that the railroad company was compelled to turn loose on the prairie because of the "strike" of its employes some time before. Witness remarked that anybody was authorized to gather that stock for the railroad company. Gallaher then remarked that, on his way to East Bernard some days before, he saw three head of that stock on the prairie, and asked witness why he did not take them up for the company. Witness told him in reply that he had nobody at the house just then to help him drive them. Gallaher then said that he would help witness if witness would go that evening. About three o'clock witness and Gallaher left the house and went out on the prairie towards Eagle Lake, to look for the cattle. They rode through the several herds on the prairie, until about sun set, when they returned to witness's house, not having found the

animals. On reaching the house, Gallaher got down, opened the gate, and watered and fed the horses. They then went to the house and as neither of them was hungry, they ate no supper. Witness and Gallaher then remained on the gallery until bed time. Witness then asked his wife where he was going to put Mr. Gallaher to sleep. She replied that she had made a pallet on the floor of her room for witness and Gallaher. Witness and Gallaher then went to bed on the pallet spread on the floor by Mrs. Cooper, and slept on that pallet throughout the night. Gallaher left witness's house between eight and nine o'clock on the next morning, going towards Eagle Lake.

Cross examined, the witness stated that it was quite sun set when he and Gallaher returned to the house from the cattle hunt. They ate no supper, but the children had a cold snack. After they took seats on the gallery upon returning from the cattle hunt, they did not get up until they went to bed. The pallet in which the witness and Gallaher slept was spread on the floor about four feet from the bed in which his wife and little boy slept. Witness's mother and his three remaining children, occupying two beds, slept in the other downstairs room. Busch and Railey separately occupied the two rooms up stairs. Railey was a half idiot and would not sleep in the same room with any body else. Neither Busch nor Railey had bedsteads, but slept on mattress pallets. Witness called Railey at four o'clock on the next morning. He brought his light down with him. He always took his lamp with him at night, and would bring it down with him lighted, next morning, even if it was broad day light. When Railey came into witness's room he remarked to witness: "You said it was five o'clock, but it is only four." He then went into the room occupied by witness's mother, in which the stove was situated, and made a fire. Railey's work was to make fires and hold off calves while Busch milked. Busch got up a short while after Railey did, and went to the lot and fed the stock and milked. Gallaher got up a short while after Busch did. Witness's wife got up before witness did, and witness did not get up until about daylight. After getting up the witness bathed, and went to the gallery, took a seat and smoked, and about the time he got through smoking, breakfast, which his wife prepared, was served. Gallaher then went to the lot and rubbed off his horse with a cob. He then asked witness to go with him to Eagle Lake, but witness declined, as he had to go and inspect a piece of hay ground for Dellno. When Gallaher

started off about nine o'clock, he left his slicker. Witness sent Railey with it to overtake him. Railey returned with the slicker and a message from Gallaher for witness to keep it, as he had another one.

It was seven miles from the witness's house to Eagle Lake. Witness did not go to the depot at New Philadelphia in the afternoon of Wednesday, December 7. Witness and Gallaher stayed at the depot in the morning about an hour before they went to witness's house to dinner. Mr. Anders, John Luke, Dick Moore, Dick Duboy and Mr. Hoadley were at the depot when witness and Gallaher left to go to dinner. While at the depot witness saw Cass Adams, Carroll Adams and a young man named Lindsey. He did not see Bob Cooper. Witness came to Wharton on the second Sunday previous to this trial. Louis Busch came with witness to drive and to open gates. The witness saw Stewart and Mansfield at New Philadelphia on the second Saturday before this trial, and was then told by them that Gallaher had been arrested for the murder of Mrs. Brown, and that Gallaher claimed to have spent Wednesday night, December 7, at his, witness's, house. Witness told the parties that Gallaher's statement to them was true, and Stewart then advised witness to go to Wharton with them. Witness replied that, as he had no money, he would have to go in his hack, and that he would start to and reach Wharton on the next day, Sunday. Witness came to Wharton on the next day, the said Sunday, and came for the purpose of testifying that Gallaher was with him on the prairie near New Philadelphia, and at his house from noon on the fatal Wednesday until nine o'clock on Thursday morning. Witness did so because he knew as an absolutely positive fact that Gallaher was innocent of the Brown murder. The witness had never been subpœnaed, but was directed by Major Dennis, Gallaher's counsel, not to leave Wharton. The witness and Louis Busch were staying at Stagley's. The board bills and other expenses of both witness and Louis Busch were being paid by Mr. Daman, the nephew of Captain Gallaher. On the way to town Busch asked the witness what they would do for money, and witness told him that he would get Mr. Daman to pay the hotel and stable bills. The witness was not a relative of Captain Gallaher, but since 1868 he and Gallaher had been neighbors and intimate friends. Witness was up, doctoring his ears, about eleven o'clock on Wednesday night, and saw Galla-

her in bed at that time. Witness had not been paid nor promised any pay for testifying in this case.

Continuing, the witness said that he came to Wharton county from Orange county. Witness was elected sheriff of Orange county, but resigned a short time before the expiration of his term of office. The witness was neither forced nor asked to resign the office of sheriff of Orange county. He had no trouble whatever while sheriff, and resigned over the protests of the people at large and the commissioners court. The witness at that time had a brother in Wharton county, who wrote witness and induced him to come to Wharton county. Witness knew the cousin of Mr. Barbee before he (witness) came to Wharton county. When he met Mr. Barbee in Wharton the first time he told Mr. Barbee that he felt on meeting him like he had met a friend, because his (Barbee's) cousin did him a favor once by standing off a mob. He had no recollection of ever telling Barbee that his cousin prevented a vigilance committee from mobbing or hanging him. He knew that he told Barbee that his cousin had proved himself a friend to witness by keeping a mob from showing the witness foul play. Witness was referring to a fist fight he had with a man who was armed with a dirk and surrounded by sympathizers, when Barbee's cousin interfered and prevented the man's sympathizers from showing him (witness) foul play. That incident took place before the war, when witness was seventeen years old. Witness was born in 1839, and was elected sheriff of Orange county in 1865. The witness's brother came to Wharton county in 1866, and lived there until 1877. Witness lived a while in Colorado county, but in no counties but Wharton and Colorado since 1867—except a short while in Fort Bend county. At the election preceding this trial the witness was elected hide and animal inspector of Wharton county over a very popular man, and qualified as such inspector. John E. Linn was the witness's deputy at Wharton. Clarence Kemp was his deputy below Wharton, and T. J. Roberts was his deputy at New Philadelphia. Witness lost his leg in a railroad accident.

Doctor T. O. Norris testified, for the relator, that he lived at Eagle Lake and knew the relator. Witness saw the abrasion on Gallaher's arm on the day of his arrest, and it had then been very recently done. Witness had been a physician in active practice for fourteen years. Witness could not tell a single hair three inches long, taken from the head of a woman, from a hair

of the same length taken from the head of a man, unless the one was a negro and the other was a white person. If physiology or medical jurisprudence had ever laid down or attempted to lay down a rule ·by which the single hair of a white female could be distinguished from the single hair of a white male, the witness had never seen nor heard of it.

Doctor Melancon, testifying for the relator, said that the single hair of a white female could not be distinguished from that of a male, if each hair was but three inches long.

C. W. Shawaker, the next witness for the relator, exhibited a a diagram of the "Davy James" house, and explained it to the court. His testimony, however, was unimportant except in showing that the kitchen was built separate from the main house, and was connected therewith by a passage which was erected on a platform, which passage was inclosed except on the side next to the front room, which was the room occupied by the Browns, and that the room of the Browns could be more readily reached from that passage than by passing through the kitchen, as, according to the witnesses David and Judy James and Henry Allen, they did do.

Mrs. Elizabeth Cooper, the wife of J. C. (Rhody) Cooper, testified, for the relator, that her husband and the relator came to said Cooper's house near New Philadelphia between twelve and one o'clock on Wednesday, December 7, 1887. They remained at the house together until about three o'clock in the evening, when they rode off together, and returned together about sun down on the same evening. Gallaher and Rhody Cooper went to bed between eight and nine o'clock on that night in the witness's room, occupying a pallet made down on the floor by the witness. She made the pallet down in that room because none of the other rooms, save that occupied by Mr. Cooper's aged mother, was in a condition to accommodate a guest, and she had no bedstead in her room other than that she occupied herself. Captain Gallaher occupied the pallet with Mr. Cooper throughout the night, and did not leave Cooper's house until about nine o'clock on the next morning, when he went off toward Eagle Lake. In putting Captain Gallaher with Mr. Cooper on a pallet the witness did the best she could do for a friend. Mr. Gallaher had taken dinner at witness's house since the killing of the Browns, but he and witness did not discuss the case. She had discussed it with nobody except Mr. Cooper and Major Dennis, one of Gallaher's attorneys.

Captain Van Houten was the next witness for the relator. He testified that he lived on, and had charge of Captain Gallaher's plantation in Wharton county, Texas. He had lived in Wharton county for the last thirty years except three years spent in San Antonio. He had lived on the Gallaher plantation since December, 1886. The plantation enclosed six hundred acres, but it was not all cultivated. The three pastures of Gallaher adjoining the plantation enclosed five or six thousand acres. The entire body of land enclosed was between six and seven thousand acres. Mrs. Brown at one time lived on the East Bernard, three or four hundred yards above the upper line of Gallaher's upper field fence. She also lived for a while at East Bernard station, a mile and a quarter or a mile and a half from the depot. Her house last mentioned was between eight hundred and a thousand yards distant from the "Davy James house," towards the depot. The Davy James house was twelve or fourteen miles distant from New Philadelphia. The country between the James house and New Philadelphia was enclosed in pastures, and the roads ran through the pastures. It rained a great deal in the winter of 1887, but witness did not remember the condition of the roads in December of that year. Mrs. Brown's house (the one between Gallaher's upper field fence and East Bernard station), was destroyed by fire some time between 1880 and 1884, when witness was in San Antonio, and she had not lived in the immediate neighborhood of Gallaher's plantation since, until she captured the James house. Mrs. Brown was a rather stout woman, and was by no means a timid one. On the contrary, she was a remarkably bold and determined woman. The witness had known her since 1854 or 1855.

Captain Gallaher spent the night of Tuesday, December 6, 1887, at his plantation, sleeping with the witness. He left that plantation early on the morning of the fatal Wednesday, saying that he was going to Wharton or Eagle Lake, or Wharton and Eagle Lake, the witness did not understand which. When he left he took the road which, passing the gin house and the James house, led into the main Wharton and Eagle Lake road. The witness next saw Captain Gallaher under arrest on the following Saturday. According to the recollection of the witness, Mrs. Brown entered and took possession of the Davy James place about a week before the fatal Wednesday. Davy James and his family were in possession of the house, under a lease from Captain Gallaher, at the time that Mrs. Brown took possession of it. Gallaher had

then owned and controlled the said house for fully fifteen years. Mrs. Brown, with her son and household effects, came to that house on the wagon of one of Mr. Fitzgerald's tenants. She took possession of it in the absence of both the witness, who was Gallaher's agent, and Davy James, who was lessee of the house. When, after she had taken possession of the house, the witness went to see about it, he found Mrs. Brown in the large or front room, which was Davy James's room. Davy was then in the house trying to "hold the fort." Witness used every persuasive argument he could bring to bear upon Mrs. Brown to induce her to leave the house, and to abide the legal determination of the question of the right of possession. Mrs. Brown became furious. She declared that the law would do nothing for her; that she had tried and tired of it, and had come to assert and maintain her rights herself. Witness then told her that if she persisted in holding forcible possession of the house, he would secure the intervention of the sheriff and have her put out. She replied that neither the witness, Jim Gallaher, the sheriff, nor the Governor of Texas could get her out of the house; that the house was hers and she was going to hold it at all hazards. Witness then went to her son Mayo, who was in the house, and opened a conversation with him. Under the impression, probably, that the witness was going to attempt to take hold and eject Mayo, Mrs. Brown drew a pistol and told witness that if he laid his hand on her son, or on anything she had in the house, he would have to take the contents of the pistol. The boy had a shot gun, but, after listening to witness awhile, he begged his mother to surrender possession of the house. Mrs. Brown's fury increased, and she stormed at the boy that he could go if he wanted to, but that she was going to stay. Finding that he could not get the woman out of the house without resorting to violence, witness left, and she slammed the door. This occurred on Thursday preceeding the fatal Wednesday. On the night of that Thursday witness went to Mr. Fitzgerald, the justice of the peace, to get him to take steps to remove Mrs. Brown from the house. Fitzgerald after examining a law book, said that he did not know what to do. He then remarked that he was going to Wharton on the next day, and advised witness to go with him, and consult Major Dennis, Mr. Gallaher's lawyer.

Witness went to Wharton on the next day, which was Friday, and waited all day for Fitzgerald, who did not reach town while witness was there. On his way home, late that evening,

witness met Fitzgerald at the Peach creek bridge.    Fitzgerald, who could not possibly reach Wharton before night, advised witness to return to Wharton on the morrow, for the purpose of conferring with Major Dennis about the Brown matter.    Witness spent that night at Green Hudgins's house, and went back to Wharton on the next day.    After some trouble he found Fitzgerald, and went with him to Major Dennis, who decided that witness should file a complaint against Mrs. Brown for carrying a pistol.    Witness then got the magistrate and county attorney together, filed complaint and secured a warrant for the arrest of Mrs. Brown for carrying a pistol, which warrant he gave to Fitzgerald, who promised to have it executed, and then he, witness, went home to await the execution of the warrant.  He was waiting yet.    Witness did not see Fitzgerald again until the following Thursday morning, which was the morning after the fatal Wednesday.    He had not then executed the warrant, but told the witness that he only got home on the night before.  When witness gave Fitzgerald the warrant in town, on the previous Saturday, he told witness that he could not execute it until Monday, but would do it on that day.

The witness was now unable to say whether Captain Gallaher was on his plantation throughout the week preceding the tragedy or whether he was there off and on.    He knew, however, that Gallaher spent the night preceding the murder with him, and on that night discussed Mrs. Brown's matter with him.    He remarked to witness that nothing could be done about the matter until the warrant should be executed, and that, as he could accomplish nothing by staying, he would return to his home on the morrow.    He left next morning, and witness did not see him again until they met, both under arrest.    The witness was arrested on the Gallaher plantation.    The witness never went back to the James house after his interview with Mrs. Brown, detailed above, until Thursday morning—the morning after the murder.    When the witness went to the quarters to wake up the gin hands on that morning, they, the gin hands, told witness that two masked men, one of whom was taken by Mrs. Brown to be Mr. Jones, or who called himself Jones, and the other Robinson, went to the Davy James house on the night before and took Mrs. Brown and her son away from there.    They said that the men were white men, whose faces were masked with dark handkerchiefs or dark pieces of calico, but that they failed to recognize either of the men.    Under the impression

that the warrant provided by witness had been executed and the Browns arrested, the witness went first to James's house, where he found James's family, and thence to the East Bernard station. At the latter place he met Fitzgerald and asked him if he had arrested the Browns, and he replied that he had not; that he had just got home the night before, and had not had time to execute the warrant. Witness then went on to Wharton to ascertain whether or not Mrs. Brown had been arrested by any other officer. Davy James told witness on that morning that the men who took Mrs. Brown and the boy from his house were muzzled. Witness thought that before starting to Wharton on that Thursday morning he telegraphed Gallaher the facts and circumstances of the removal of Mrs. Brown and the boy from the James house, as he obtained them from the negroes. Failing to find the Browns in Wharton, witness went to Sheriff Jones and reported the circumstances to him, as he had learned them. Jones and a posse went from Wharton to the plantation on the next day, Friday. On his way home from Wharton the witness met Fitzgerald, who arrested him and some of his negro hands. When witness went to Davy James's house on the morning after the Browns were taken off, he, aided by Mr. DeWitt and Davy James, put Mrs. Brown's luggage outside of the yard.

Cross examined, the witness said that he was the brother-in-law of Captain Gallaher, and the manager of his plantation. The "James house" was distant from the plantation house occupied by witness about a thousand yards. Both of said houses were on the Slaughter league. Gallaher and Mrs. Brown were not on good terms, and had not been for some time previous to the tragedy. Before retiring on Tuesday night, December 6, Gallaher asked witness what he thought had best be done about Mrs. Brown's forcible possession of the house, and witness told him that he could do nothing until the officers took some action under the warrant. When he left on Wednesday morning to go either to Wharton or Eagle Lake, or both, Gallaher rode his gray horse. During the time that Gallaher was on the plantation prior to the tragedy, he rode over it daily, but witness could not say that he did or did not visit the James house. The witness never heard Gallaher speak abusively of Mrs. Brown, but he frequently remarked that she was a "hard case." Gallaher had no affection for Mrs. Brown, which, under the circumstance was not remarkable.

Stephen Gallaher, the brother of the relator, testified, in his behalf, that he and relator were raised on the Slaughter league of land, on the East Bernard, in Wharton county. The Gallahers, father and sons, had owned part of the Slaughter league since 1836. The relator now owned, and had owned for many years, the old home place. The relator was badly wounded in the arm during the confederate war. The arm was disabled for a long time, and his eyes began to fail him about ten years before this trial.

Hope Adams testified, for the relator, that he was the agent of the Sunset railroad at New Philadelphia. During the "strike" in November, 1887, several car loads of stock cattle were turned out upon the range by the company, and witness afterwards authorized Rhody Cooper and other stock men to gather them for the company.

Doctor T. O. Norris testified, for the relator, that the relator's general health was not good, and had not been for a number of years. He suffered from chronic diarrhœa, and the effects of a gunshot wound in the shoulder or arm, said to have been inflicted during the war, and while he was in the confederate service. Witness thought that protracted confinement would injure his general health, and, as a result, endanger his life. Doctors Smith and McCamly testified substantially as did Doctor Norris.

The relator next introduced in evidence the abstract of title to the Slaughter league of land, situated on the East Bernard, in Wharton county, Texas. The only conveyance to any person named Brown shown by that abstract was a conveyance to B. B. Brown, in 1870, of four hundred acres, being tracts numbered two and three, alotted to G. and R. Slaughter, recorded in "Deed Book B, page 765."

Relator next introduced in evidence the decree of divorce in case number 986, "Mary Brown v. B. B. Brown," of date June 11, 1877. The said decree grants to B. B. Brown a divorce from Mary Brown. It shows the abandonment of the suit by the plaintiff, and that the decree was granted to the defendant upon the facts set up in his answer. The verdict of the jury found the four hundred acres of land to be community property, and the decree awarded an undivided half interest in the same to the plaintiff and the defendant, respectively. The relator next introduced in evidence the conveyance to himself by the sheriff of the two hundred acres of land awarded to B. B. Brown, and the

abstract showing his title to three thousand three hundred and twenty-eight acres of the Slaughter league.

P. E. Peareson testified, for the relator, that his law firm, Peareson & McCamly, and Colonel Dennis, represented Captain Gallaher in the suit brought by Mrs. Brown, now deceased, for the B. B. Brown four hundred acres of the Slaughter league. Witness's firm and Dennis found the decree of divorce which divested Mrs. Brown of two hundred acres of that land and vested it in B. B. Brown. Gallaher had title to B. B. Brown's two hundred acres, under a conveyance from the sheriff. Witness and his associates, acting for Captain Gallaher, offered to concede to Mrs. Brown the two hundred acres allotted to her by the decree, and agreed with her counsel to confess judgment in Mrs. Brown's favor to that extent, and her lawyers advised her to accept the proffer. Mrs. Brown absolutely refused to consider the proposition, and quarreled with and discharged her lawyers for suggesting that settlement. This was at the spring term of the court, in 1887. Colonel Delaney appeared for Mrs. Brown at the fall term, 1887, and asked a continuance, stating that he had just taken charge of the case, and as yet knew nothing about it.

Justice of the Peace Schley testified, for the relator, that he presided on the examing trial of the relator and his codefendants. During the trial the relator appeared to suffer from a violent attack of diarrhœa. He left the court room very often, stopping proceedings, to answer calls of nature, and took medicine during the progress of the trial. He said the medicine was taken to relieve his bowels, and that he was afflicted with chronic diarrhœa.

Judge Gustav Cook testified, for the relator, that he had known the relator for twenty-five years, and served through the war with him in the same command. The witness had known the relator as a remarkably diffident, retiring, modest and law-abiding man. His reputation in the army was that of a conspicuously peaceable man—a splendid soldier, whose diffidence and modesty marked his association with his comrades. He was never modest, diffident nor retiring in his conduct towards gentlemen who served under the "other flag." Judge Cook was corroborated by more than twenty witnesses, including such prominent gentlemen as Judge George Quinan, Colonel R. E. Stafford, Messrs. W. Fort Smith, J. K. Little and others, all of whom had known the relator for many years, some from his infancy, and others in the army. The several witnesses con-

curred in the statement that the relator was a man of exceptional business qualifications, and that this was the first trouble they had ever known him to encounter.

Henry Allen, recalled by the relator, testified that the horse led by the two masked men, when they came to his house on the fatal night, and which they took to the James house, was a sorrel pony with a roached mane.

The relator rested.

J. G. Barbee was the first witness called by the State in rebuttal. He testified that, on the occasion of his first meeting with Rhody Cooper, he, Cooper, told him that, in meeting witness, he felt like he had met an old friend, inasmuch as witness's cousin once did him, Cooper, a great favor in preventing a vigilance committee from mobbing or hanging him. Cooper did not say that he was in a personal difficulty when he was rescued by witness's cousin. It was in witness's saloon, in Wharton, that Cooper made that statement to witness. Cooper usually "got too much aboard" when he visited Wharton.

Sheriff J. W. Jones testified, for the State, in rebuttal, to the effect that he had Gallaher confined in jail for about two weeks prior to the present term of court, and about ten days since. Gallaher neither required nor received any better treatment than any other prisoner. He got better "grub," but paid for it. Gallaher was provided with blankets, but complained of being very cold while in jail during the examining trial. He made no other complaint that witness ever heard. He had taken medicine since he had been in jail, but the witness did not know what he took it for, nor where he got it. Gallaher looked about as well now as he did on the day he was put in jail. He was, perhaps, a little paler, but witness could see no other difference.

Seven or eight witnesses for the State testified that they knew the general reputation of Rhody Cooper for truth and veracity, and that it was bad. Several of these witnesses stated that they heard Cooper's reputation for truth and veracity called in question for the first time, after he testified on the examining trial of Gallaher for the murder of the Browns. Others stated that they were on unfriendly terms with Cooper.

In support of Rhody Cooper's reputation for truth and veracity, the relator introduced nearly or quite as many witnesses as he did to support his own as a law abiding citizen. All of those witnesses testified that they had known Cooper for many years,

and that he had always maintained an excellent reputation for honesty and truth and veracity.

*I. N. Dennis* and *P. E. Peareson,* for the relator.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. We have maturely considered the record presented on this appeal, and, from our view of the evidence as herein disclosed, we are of opinion that the appellant is entitled to bail.

The judgment of the court below refusing him bail is reversed, and appellant is admitted to bail in the sum of ten thousand dollars—five thousand dollars in each case. Upon the execution by him of a bond, in said amount of five thousand dollars, with good and sufficient sureties in each case, conditioned as the law requires, he will be released from custody by the sheriff of Wharton county.

The judgment is reversed and bail granted.

*Ordered accordingly.*